UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JUSTIN C GASAWAY,<br>PAUL D AUBIN,<br>DYLLON WARE,<br><br>                Plaintiffs,<br><br>                v.<br><br>VIGO COUNTY SHERIFF'S DEPARTMENT,<br>JOHN PLASSE Individually and in his Capacity<br>as Sheriff of Vigo County,<br><br>                Defendants. | No. 2:21-cv-00454-JMS-MJD |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Justin Gasaway, Paul Aubin, and Dyllon Ware were pretrial detainees in the Vigo County Jail from the onset of the COVID-19 pandemic through 2022. They filed this civil rights suit alleging that they were subjected to unconstitutional conditions of confinement while incarcerated in the jail, and, as a result, contracted the virus. They also asserted state law negligence claims in their complaint.

The defendant, Vigo County Sheriff John Plasse, has filed a motion for summary judgment. Dkt. 70. For the reasons below, that motion is **granted** as to the negligence claims and Fourteenth Amendment claims against Sheriff Plasse in his individual capacity but **denied** as to the Fourteenth Amendment claims against him in his official capacity.

**I.
Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no

1

genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572−73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II.
## Factual Background

Because Sheriff Plasse has moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s]

2

all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

### A. COVID-19 Policies at the Vigo County Jail

On March 6, 2020, Indiana Governor Eric Holcomb issued Executive Order 20-02, which declared that a public health emergency existed throughout the state as a result of the COVID-19 outbreak in the United States. Dkt. 74-1 at 1.

In responding to the pandemic, the Vigo County Jail undertook some health precautions at the direction and recommendation of the Vigo County Department of Health. Dkt. 70-6 at ¶ 37. As the sheriff of Vigo County, Sheriff Plasse testified that his "duties are, number one, to operate the jail, make sure inmates are safe and secure in the jail." Dkt. 70-1 at 7. Jail Commander Charles Funk and Jail Matron Casey Lee were responsible for the day-to-day operations at the jail. *Id.* at ¶¶ 1, 6−7. Sheriff Plasse spoke to Commander Funk "quite frequently on jail matters." Dkt. 70-1 at 8. With respect to policy decisions at the jail, Sheriff Plasse would meet with Commander Funk "and go over things if [they] have issues to see how [they] go forward." *Id.* At all relevant times, the jail was overcrowded. *Id.* at 19.

Inmates booked into the jail were quarantined for two weeks beginning in March 2020. *Id.* at ¶ 8. The jail issued masks to inmates attending court hearings in June 2020. *Id.* at ¶ 14. Jail staff began wearing masks in August 2020. *Id.* at ¶ 15. Masks were given to inmates who were in quarantine, leaving general population, moving around the facility, and in common areas in November 2020. *Id.* at ¶ 17. According to a Vigo County Health Department Administrator, "The CDC or Board of Health did not *mandate* inmates or staff to wear masks at jails in November of 2020." Dkt. 70-5 at ¶ 17 (emphasis added). Nor did they mandate jail staff to wear rubber gloves in 2020. *Id.* at ¶ 18.

In December 2020, an inmate who died following a medical episode tested positive for COVID-19. Dkt. 70-6 at ¶ 20. The Indiana Department of Health ordered that all of the inmates in the jail be tested following his death, and over 100 inmates, including the three Plaintiffs, tested positive. Dkt. 70-7 at ¶¶ 9−11. After this COVID-19 outbreak, all inmates were provided and required to wear masks. Dkt. 70-6 at ¶ 24. Before the outbreak, inmates were not required to wear masks "because of concerns related to compliance." Dkt. 70-5 at ¶ 16. Sheriff Plasse also testified that inmates were not required to wear masks because someone at the Health Department told Commander Funk that "there would be a lot of respiratory issues if they wore them 24/7; and that's the advice we acted on and did not require them to wear them at that time." Dkt. 70-1 at 11.

After the outbreak, the Indiana Department of Health instructed the jail to be locked down. Dkt. 70-6 at ¶ 29. Inmates who tested positive were placed in separate cellblocks and quarantined for two weeks. *Id.* at ¶ 26. During the lockdown, inmates were allowed out of their cells for one hour each day to shower and speak with family by phone or through the kiosk. *Id.* at ¶ 30. The jail's medical department spoke to inmates in groups about what a positive COVID-19 test meant and what signs and symptoms to look for. *Id.* at ¶¶ 31−32, 34. Inmates who tested positive were prescribed Tylenol by the Medical Department. *Id.* at ¶ 33. Jail officers were instructed to contact the medical department if any inmate complained of COVID-19 symptoms. *Id.* at ¶ 36. Recreation was suspended after the outbreak, and it did not resume until inmates were transferred to the new Vigo County Jail facility in November 2022. Dkt. 70-7 at ¶ 12.

Inmates are supposed to be provided with cleaning supplies each day, which include a mop, a mop bucket with a cleaning solution with disinfectant, dust mop, toilet brush, spray bottle, and rags. *Id.* at ¶¶ 15−18. Trustees began disinfecting hard surfaces and holding cells in March 2020. *Id.* at ¶ 19. More cleaning materials were provided after the December 2020 outbreak. *Id.* at ¶ 20.

A "fogging machine" was purchased in December 2020 and is used several times a week to disinfect the isolation, hospital, solitary cells, and high traffic areas, in addition to vehicles transporting inmates who have tested positive for been exposed to COVID-19. *Id.* at ¶¶ 22−23.

COVID-19 tests were not available at the jail until December 2020 when the Health Department provided them. Dkt. 70-5 at ¶¶ 19−20. COVID-19 vaccines did not become available in the jail until March 2021. *Id.* at ¶¶ 29−30.

### B. Plaintiffs' Experiences at the Jail, Illnesses, and Claims

Plaintiffs were pretrial detainees at all times relevant to their complaint. Mr. Aubin was at the Jail from December 2019 until April 2022. Dkt. 70-2 at 10−11. Mr. Ware was at the Jail from March 2019 through July 2022. Dkt. 70-3 at 8. Mr. Gasaway was at the Jail from January 2020 through July 2022. Dkt. 70-4 at 6, 8.

According to Plaintiffs, the cleaning supplies at the jail were inadequate to protect them from COVID-19. Each day, only one rag would be provided for a block that housed over 30 inmates. Dkt. 70-2 at 43−44. At times, no rags would be distributed, so inmates would tear up their clothes and use them to wipe down surfaces. Dkt. 70-3 at 39, 63−64. Mr. Ware testified that sometimes the liquid in the mop bucket was just water, with no cleaning solution, and other times the mop water would not be switched out in a timely manner. Dkt. 70-3 at 39, 41−42, 47. Mr. Aubin testified that there were delays with laundry, and at times inmates went for a month without having their clothing laundered. Dkt. 70-2 at 28−31.

Plaintiffs all testified that they believed that both jail staff and inmates should have been required to wear masks earlier in the pandemic; Mr. Aubin and Mr. Ware both pointed out that it took an inmate dying for the jail to provide them masks. Dkt. 70-2 at 37; dkt. 70-3 at 10; dkt. 70-4 at 20-22. Mr. Gasaway and Mr. Ware testified that they believed that staff and inmates who

handled food and inmate property should have been required to change gloves on a more regular basis. Dkt. 70-4 at 22−23. Mr. Aubin believes they should have tried to implement social distancing. Dkt. 70-2 at 37.

All three Plaintiffs tested positive for the virus during the outbreak. Mr. Gasaway had cold-like symptoms and diarrhea, lost his sense of taste, and was sore. Dkt. 70-4 at 25. Mr. Ware, who has asthma, said that he "couldn't breathe" and would do controlled breathing exercises to make his lungs feel better. Dkt. 70-3 at 56−57. Mr. Aubin said that he had a migraine-type headache, a sore throat, and respiratory issues. Dkt. 70-2 at 23. Mr. Aubin also testified that he experienced COVID-like symptoms in the spring of 2020, but nursing staff did not want to consider COVID-19. *Id.* at 36. He testified, "It was almost like it was a, 'We don't want to talk about COVID symptoms. It's anything but that.'" *Id.* He said "numerous people" in his cell block experienced COVID symptoms at that time. *Id.* at 37. Mr. Ware also testified that he and other inmates had COVID symptoms before the outbreak and told a correctional officer, "Hey, we're getting sick, and we're getting sick fast." Dkt. 70-3 at 10. The officer responded that the nurses would not do anything about it absent a medical emergency, "[a]nd then after somebody died, they finally did something about it." *Id.* at 11.

### III.
### Discussion

Plaintiffs argue that their rights were violated because Sheriff Plasse failed to implement enough safety measures to prevent COVID-19 from spreading in the jail, resulting in their illness. Sheriff Plasse argues that he is entitled to summary judgment because (1) he was not personally involved in protecting Plaintiffs from COVID-19 and is otherwise entitled to qualified immunity, (2) the Sheriff's Department did not have a policy, custom, or practice of violating Plaintiffs'

Fourteenth Amendment rights, and (3) Plaintiffs failed to file a tort claim notice as required by Indiana law.

### A. Individual Liability

Conditions-of-confinement claims for pretrial detainees, which are derived from the Due Process Clause of the Fourteenth Amendment, are analyzed under an objective standard. *Hardeman v. Curran*, 933 F.3d 816, 821−22 (7th Cir. 2019). Under this standard, the plaintiff must show "that the conditions in [the jail] posed an objectively serious threat to his health; that the [defendant's] response was objectively unreasonable under the circumstances; and that [he] acted purposely, knowingly, or recklessly with respect to the consequences of [his] actions." *Mays v. Emanuele*, 853 F. App'x 25, 27 (7th Cir. 2021) (citing *Hardeman*, 933 F.3d at 823, 827 and *Miranda v. County of Lake*, 900 F.3d 335, 353−54 (7th Cir. 2018)).

Sheriff Plasse first argues that he was not personally involved in establishing COVID-19 safety precautions at the jail. "Individual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted). But Sheriff Plasse testified that he was responsible for the inmates' safety at the jail and would meet with Commander Funk regularly to discuss policy. Dkt. 70-1 at 7−8. Thus, there is at least a dispute of material fact with respect to his level of personal involvement, and he is not entitled to summary judgment on this basis.

Turning to the Fourteenth Amendment analysis, a reasonable jury could find that the COVID-19 virus created a serious risk of harm to Plaintiffs' health, and that the general risk of exposure was exacerbated by the conditions that they were subjected to. *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (finding that "the objective prong is easily satisfied" as to

inmates' claims under Eighth Amendment challenging conditions of confinement in federal prison with dormitory housing at the start of the pandemic).

Thus, the Court must decide if Sheriff Plasse responded reasonably to the pandemic or was reckless with the precautions he implemented. The Court declines to determine whether a jury could conclude that Sheriff Plasse's response was objectively unreasonable because it concludes that he is entitled to qualified immunity.

"Qualified immunity is a doctrine that protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (cleaned up). Once a defendant raises qualified immunity as a defense, the burden shifts to Plaintiffs to defeat it by showing "two elements: first, that the facts show a violation of a constitutional right, and second, that the constitutional right was clearly established at the time of the alleged violation." *Id.* (cleaned up). "'If *either* inquiry is answered in the negative, the defendant official' is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (emphasis in original)).

The Court finds the second element dispositive. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. . . . Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 11−12 (2015) (cleaned up). Courts cannot define "clearly established law at a high level of generality" but rather must assess "whether the violative nature of *particular* conduct is clearly established." *Id.* (cleaned up). The

doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments[.]" *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

It is clearly established that prison officials may not "be deliberately indifferent to the exposure of inmates to a serious, communicable disease" under the Eighth Amendment, *Helling v. McKinney*, 509 U.S. 25, 33 (1993), and that the right to safe conditions extends to pretrial detainees under the Fourteenth Amendment, *Hardeman*, 933 F.3d at 821−22. And although COVID-19 was a new virus, the duty to protect inmates from needless exposure to a serious illness "need not be litigated and then established disease by disease[.]" *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017).

But the issue is whether Sheriff Plasse was on notice that his particular conduct—failing to provide adequate cleaning supplies, failing to implement a universal mask rule before the December 2020 COVID-19 outbreak, and failing to procure COVID-19 tests—violated Plaintiffs' Fourteenth Amendment rights. Plaintiffs have cited no case that suggests as much, and the Court can find none. Instead, many courts have granted qualified immunity to jail and prison administrators given the evolving nature of the virus and the related recommendations for keeping incarcerated individuals safe. *See, e.g., Jones v. Burt*, Case No. 1:21-cv-41, 2022 WL 4244298, *5 (W.D. Mich. July 15, 2022) (granting qualified immunity on claim related to failure to social distance because "[n]o court has found that the inability of prison officials to ensure social distancing occurs during the COVID-19 pandemic, standing by itself, and in light of other measures . . . such as . . . setting up isolation areas for known COVID-positive prisoners, violates the Eighth Amendment."); *Ross v. Russell*, Case No. 7:20-cv-000774, 2022 WL 767093, *14 (W.D. Va., Mar. 14, 2022) (finding jail officials were entitled to qualified immunity because, given

the ongoing and changing guidance from health officials as to a novel virus, "neither the policies or occasional lapses [in enforcing the policies] were clearly insufficient to protect prisoners").

Qualified immunity is especially appropriate because Sheriff Plasse is a correctional professional, not a health professional. The undisputed evidence is that the COVID-19 protective measures implemented at the jail were at the recommendation of the Vigo County Health Department. Dkt. 70-6 at ¶ 37. Courts have "long recognized that correctional institutions typically engage in the division of labor between medical professionals and other security and administrative staff," and therefore it was reasonable for Sheriff Plasse to defer to the health department for guidance on handling COVID-19 within the jail. *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) (cleaned up) (upholding grant of qualified immunity for jail officials in medical care context because Seventh Circuit precedent "dictates that corrections officers are not constitutionally obligated to override the judgment of medical professionals unless they have reason to know that an inmate is receiving inadequate treatment"); *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019) (holding that plaintiff could not prove the subjective element of deliberate indifference claim "because the defendants are all non-medical officials who reasonably relied on the judgment of medical professionals").

Accordingly, summary judgment is **granted** as to Sheriff Plasse in his individual capacity.

### B. Practice-or-Policy Claim

The Court now turns to whether Sheriff Plasse is entitled to summary judgment in his official capacity. *See Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999) ("Indiana Code § 36-2-13-5(a) provides without further qualification that it is the sheriff's duty to take care of the jail and its prisoners. Thus, . . . the sheriff serves as the county's official decision-maker in matters involving the county jail.").

In order to maintain a § 1983 claim against Sheriff Plasse in his official capacity, Plaintiffs must show that their constitutional rights were violated by a policy or custom of the Sheriff's Department. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694−95 (1978). "The critical question under *Monell* is whether a policy or custom of a municipal entity caused a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022).

For *Monell* liability to attach, Plaintiffs must first show that he was deprived of a federal right, and then he must show that the deprivation was caused by a Sheriff's Department custom or policy or failure to implement a needed policy. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Further, to the extent that they are challenging a facially lawful policy (express or implied), they must provide evidence of a "pattern of similar constitutional violations resulting from the policy." *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022) (cleaned up). When challenging an unconstitutional municipal practice or custom, Plaintiffs must show "evidence that the identified practice or custom caused multiple injuries." *Id.* (cleaned up).

      **i.**    **Deprivation of a Constitutional Right**

As previously discussed, conditions-of-confinement claims for pretrial detainees are analyzed under an objective standard, and Plaintiffs need only show that an individual defendant's response to a serious risk to their health is "objectively unreasonable" given the totality of the circumstances. *Hardeman*, 933 F.3d at 821−22. However, *Monell* liability only attaches when the plaintiff shows that the municipality acted with deliberate indifference. *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020). As the Supreme Court has explained,

> [Q]uite apart from the state of mind required to establish the underlying constitutional violation . . . a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a

11

>  plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.

*Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 407 (1997); *see also Miranda*, 900 F.3d at 345, 352 (applying deliberate indifference standard to pretrial detainee's *Monell* claim despite disavowing that standard for pretrial detainee's claims against individual defendants).

Thus, the Court analyzes Plaintiffs' claim under the deliberate indifference standard. Under that standard, Plaintiffs must show that they were at serious risk of exposure to harm, and the Sheriff "kn[ew] of a substantial risk of harm to an inmate and either act[ed] or fail[ed] to act in disregard of that risk." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations and citations omitted). The fact that they contracted COVID-19 is not enough to show deliberate indifference because Sheriff Plasse can avoid liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

There is no dispute that the COVID-19 virus created a serious risk of harm to detainees' health, and that the general risk of exposure is exacerbated by the close quarters that detainees are subjected to. *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (finding that "the objective prong is easily satisfied" as to inmates' claims under Eighth Amendment challenging conditions of confinement in federal prison with dormitory housing at the start of the pandemic).

Thus, the Court must determine whether there is a dispute of fact as to whether the Sheriff's policies related to COVID-19—or lack thereof—evinced deliberate indifference. The Court concludes there is.

First, a jury could find that Sheriff Plasse was deliberately indifferent by failing to create a comprehensive written policy to combat the spread of COVID-19 in the jail. In *Glisson v. Indiana*

*Department of Corrections*, 849 F.3d 372, 382 (7th Cir. 2017), the Seventh Circuit concluded that a medical services provider could be liable for failing to establish a protocol for the coordinated care of chronic illnesses because the need for such a protocol was "obvious," so a jury could find that the lack of protocol caused the plaintiff's death. While the Court recognizes that the evolving nature of the COVID-19 virus and guidance provided by the CDC would warrant a flexible approach, a jury could find that the lack of a written policy resulted in a haphazard response in the jail.

To the extent that the Sheriff's Department had a policy to combat COVID-19, a jury could conclude that the few steps taken were so ineffectual as to evince deliberate indifference. Plaintiffs produced evidence that the cleaning materials were inadequate given the pandemic. There was no evidence that inmates were provided educational materials about COVID-19 before the December 2020 outbreak. Sheriff Plasse does not explain why jail staff members were not required to wear masks until August 2020. And although the CDC never *mandated* masks for inmates in correctional facilities, reports from the CDC show that it was recommended that inmates be provided cloth masks in May 2020.[1] There was no evidence that staff members were screened for symptoms upon entry into the jail. A jury could find that the few policies enacted—increased cleaning and quarantining incoming inmates—were insufficient in light of the serious risks posed by COVID-19 and other reasonable measures that could have been taken. *See Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (upholding grant of preliminary injunction where officials at immigration detention center failed to provide detainees masks or compel guards to wear masks, failed to enact social distancing measures, and failed to provide sufficient soap or hand sanitizer).

---

[1] *See* CDC, Morbidity and Mortality Weekly Report, "COVID-19 in Correctional and Detention Facilities – United States, February-April 2020," https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm (May 15, 2020).

Many courts have granted summary judgment in favor of municipalities for their responses to the COVID-19 pandemic, but the jail officials in those cases enacted far more comprehensive policies than those presented here. *See e.g. Harb v. Penzone*, Case No. CV-21-01032-PHX-MTL, 2022 WL 17177675, *12 (D. Ariz. Nov. 23, 2022) (Maricopa County Sheriff not deliberately indifferent where in March 2020 jail enacted policies that restricted visitors, reduced inmate populations, distributed masks and cleaning supplies to inmates, required staff and inmates to wear masks, instituted screening protocols for everyone entering the jail, etc.); *Brogan v. BRRJA*, Case No. 7:21-cv-00180, 2022 WL 875040, *5 (W.D. Va. Mar. 23, 2022) (similar provisions including masks, temperature checks, and testing); *Carpenter v. Thurston County*, Case No. 3:21-cv-05859-BJR-JRC, 2022 WL 3239754, *5 (W.D. Wash. June 13, 2022) (similar provisions including screenings, quarantines, face mask directives, social distancing, and enhanced cleaning). In this case, however, there are disputes of material fact as to whether the Sheriff was deliberately indifferent to the serious risks of harm given the minimal safety measures he undertook.

Further, Plaintiffs produced evidence that multiple inmates were injured by the Sheriff's policies. *Helbachs Café LLC*, 46 F.4th at 530. One inmate tragically died, and over 100 inmates—including Plaintiffs—tested positive for COVID-19 shortly after his death.

Because there are disputes of material fact as to whether Sheriff Plasse's COVID-19 policies caused Plaintiffs to suffer a constitutional injury, summary judgment must be **denied** as to the official capacity claim against him.

### C. Negligence Claim

Finally, Sheriff Plasse argues that Plaintiffs' negligence claim fails as a matter of law because they did not comply with the notice requirement under the Indiana Tort Claims Act ("ITCA"). Dkt. 71 at 17−18. "The ITCA provides in relevant part that a claim against a political

subdivision is barred unless notice is filed with 'the governing body of that subdivision . . . within one hundred eighty days (180) days after the loss occurs.'" *Chariton v. City of Hammond*, 146 N.E.3d 927, 931 (Ind. Ct. App. 2020) (quoting I.C. § 34-13-3-8)). "'Compliance with the notice provisions of ITCA is a procedural precedent which the plaintiff must prove and the trial court must determine prior to trial.'" *Id.* (quoting *Brown v. Alexander*, 876 N.E. 2d 376, 383 (Ind. Ct. App. 2007), *trans. denied* (2008)).

Plaintiffs did not respond to Sheriff Plasse's argument that they failed to comply with the notice requirement. Indeed, they did not discuss their state law negligence claim at all in their response. Dkt. 74. Accordingly, summary judgment is **granted** with respect to the state law negligence claim.

## IV.
## Conclusion

For the foregoing reasons, the Sheriff Plasse's motion for summary judgment, dkt. [70], is **granted** as to the state law negligence claims and Fourteenth Amendment claims against Sheriff Plasse in his individual capacity, and **denied** as to the practice-or-policy constitutional claims against him in his official capacity.

This matter is set for a final pretrial conference on July 27, 2023, and a trial to begin on August 21, 2023. The magistrate judge is asked to hold a settlement conference as soon as practicable.

**IT IS SO ORDERED.**

Date: 5/5/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

David P. Friedrich
WILKINSON GOELLER MODESITT WILKINSON AND DRUMMY
dpfriedrich@wilkinsonlaw.com

William Russell Morris, Jr.
LAW OFFICE OF WILLIAM R. MORRIS, JR.
wimorris.attorney@gmail.com

Magistrate Judge Mark Dinsmore